EILEEN M. DECKER
United States Attorney
PATRICIA A. DONAHUE
Assistant United States Attorney
Chief, National Security Division
JUDITH A. HEINZ (Cal. Bar No. 176264)
Assistant United States Attorney
Senior Litigation Counsel, National Security Division
JULIUS J. NAM (Cal. Bar No. 288961)
Assistant United States Attorney
General Crimes Section
     1500/1200 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-7280/4491
     Facsimile: (213) 894-7631/0141
     E-mail:  judith.heinz@usdoj.gov
     E-mail:  julius.nam@usdoj.gov
DEIRDRE Z. ELIOT (Cal. Bar No. 145007)
Assistant United States Attorney
Terrorism and Export Crimes Section
     8000 United States Courthouse
     411 West Fourth Street
     Santa Ana, California 92701
     Telephone: (714) 338-3599
     Facsimile: (714) 338-3564
     E-mail:  deirdre.eliot@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| UNITED STATES OF AMERICA, | No. SA CR 15-00060(A)-DOC |
|---|---|
| Plaintiff, | **GOVERNMENT'S TRIAL MEMORANDUM** |
| v. | Trial Date:  June 7, 2016 |
| | Trial Time:  8:00 a.m. |
| NADER SALEM ELHUZAYEL and MUHANAD ELFATIH M. A. BADAWI, | Location:  Courtroom 9D of the Hon. David O. Carter |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Judith A. Heinz,

Deirdre Z. Eliot, and Julius J. Nam, hereby submits its trial memorandum.

This memorandum is accompanied by the attached memorandum of points and authorities, the files and records in this case, and any further evidence or argument the Court may wish to consider.

Dated: June 2, 2016                    Respectfully submitted,

                                       EILEEN M. DECKER
                                       United States Attorney

                                       PATRICIA A. DONAHUE
                                       Assistant United States Attorney
                                       Chief, National Security Division


                                              /s/
                                       JUDITH A. HEINZ
                                       Assistant United States Attorney


                                              /s/
                                       DEIRDRE Z. ELIOT
                                       Assistant United States Attorney


                                              /s/
                                       JULIUS J. NAM
                                       Assistant United States Attorney

                                       Attorneys for Plaintiff
                                       UNITED STATES OF AMERICA

# I.    STATUS OF THE CASE

A.    Defendants Nader Salem Elhuzayel ("defendant Elhuzayel") and Muhanad Elfatih M.A. Badawi ("defendant Badawi") (collectively, "defendants") are charged in a thirty-count first superseding indictment ("FSI").  Both defendants are charged with conspiring to provide material support or resources to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B.  Defendant Elhuzayel is additionally charged with attempting to provide material support or resources to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B, and bank fraud, in violation of 18 U.S.C. §§ 1344, 2.  Defendant Badawi is additionally charged with aiding and abetting an attempt to provide material support or resources to a designated foreign terrorist organization, in violation of 18 U.S.C. §§ 2339B, 2, and financial aid fraud, in violation of 20 U.S.C. § 1097(a).  In addition, the FSI brings a forfeiture allegation as to defendant Elhuzayel pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).  (CR 41.)

B.    Trial in this matter is set for June 7, 2016, in the Courtroom of the Honorable David O. Carter, at 8:00 a.m.  Trial by jury has not been waived.

C.    Both defendants are detained pending trial.

D.    The government expects its case-in-chief to last approximately 25 trial days.

E.    At this time, the government anticipates calling approximately 45 witnesses in its case-in-chief.  This approximation does not include 23 witnesses the government identified in its 902(11) Notice of Intent to Offer Evidence Pursuant to Rule 902(11)

1

of the Federal Rules of Evidence, filed with the Court on May 28, 2016 (CR 129), as custodians of records who may testify as to the foundation of the business records the government will seek to introduce at trial.

F.   No stipulations have been reached in this matter.  In May 2016, the government offered multiple stipulations to defendants, which they declined or have not responded to.

G.   A copy of the FSI, with revisions made for submission to the jury as agreed upon by the parties, is attached to this trial memorandum.

## II.   GOVERNING STATUTES

### A.   Counts One, Two, and Three: 18 U.S.C. § 2339B (Providing Material Support or Resources to Designated Foreign Terrorist Organizations)

Section 2339B of Title 18 of the United States Code stated, at the time of the alleged offense conduct, in pertinent part:

> Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both[.] . . . To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).[1]

"[T]he term 'terrorist organization' means an organization designated as a terrorist organization under section 219 of the Immigration and Nationality Act."  18 U.S.C. § 2339B(g)(6).

---

[1] The statute currently in effect provides for a statutory maximum sentence of 20 years.

Section 2339A(b)(1) defines "material support or resources" for both § 2339A and § 2339B (see 18 U.S.C. § 2339B(g)(4)), including in the definition the following: "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials."  18 U.S.C. § 2339A(b)(1).

**B.     Count Four through Twenty-Nine: 18 U.S.C. § 1344 (Bank Fraud)**

Section 1344 of Title 18 of the United States Code states, in pertinent part:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice – (1) to defraud a financial institution, or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretense, representations, or promises; shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1344.

**C.     Count Thirty: 20 U.S.C. § 1097(a) (Financial Aid Fraud)**

Section 1097(a) of Title 20 of the United States Code states, in pertinent part:

> Any person who knowingly and willfully embezzles, misapplies, steals, obtains by fraud, false statement, or forgery, or fails to refund any funds, assets, or property provided or insured under this subchapter and part C of subchapter I of chapter 34 of title 42 or attempts to so embezzle, misapply, steal, obtain by fraud, false statement or forgery, or fail to refund any funds, assets, or property, shall be fined not more than $20,000 or imprisoned for not more than 5 years, or both, except if the amount so embezzled, misapplied, stolen, obtained

3

by fraud, false statement, or forgery, or failed to be refunded does not exceed $200, then the fine shall not be more than $5,000 and imprisonment shall not exceed one year, or both.

Section 1097(a) is found is Subchapter IV of Chapter 28 of Title 20 of the United States Code; Part A of this subchapter lists federal grants that are available to students in attendance at institutions of higher education, including federal Pell Grants.  20 U.S.C. §§ 1070, 1070a.

D.    **Forfeiture Count: 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)**

Section 981(a)(1)(C) of Title 18 of the United States Code states, in pertinent part, that the following property "is subject to forfeiture to the United States": "Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of section . . . 1344 of this title . . . ."

Section 2461(c) of Title 28 of the United States Code states, in pertinent part:

If a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized, the Government may include notice of the forfeiture in the indictment or information pursuant to the Federal Rules of Criminal Procedure. If the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case pursuant to the Federal Rules of Criminal Procedure and section 3554 of title 18, United States Code. The procedures in section 413 of the Controlled Substances Act (21 U.S.C. 853) apply to all stages of a criminal forfeiture proceeding, except that subsection (d) of such section applies only in cases in which the defendant is convicted of a violation of such Act.

//

//

//

4

**III.  ELEMENTS AND OTHER PERTINENT LAW OF THE CHARGED OFFENSES**

   **A.   Count One: 18 U.S.C. § 2339B (Conspiracy to Provide Material Support to a Foreign Terrorist Organization)**

   The elements of Conspiracy to Provide Material Support to a Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B, as alleged in Count One of the FSI, are:

> First, beginning on or about a date unknown and ending on or about May 21, 2015, there was an agreement between two or more persons to provide material support or resources to a designated foreign terrorist organization;
>
> Second, the defendant became a member of the conspiracy knowing of its object and intending to help accomplish it;
>
> Third, the defendant knew that the Islamic State of Iraq and the Levant ("ISIL"), also known as the Islamic State of Iraq and Syria ("ISIS"), was a designated foreign terrorist organization or had engaged or was engaging in terrorist activity or terrorism; and
>
> Fourth, the offense occurred in whole or in part in the United States.

See Ninth Circuit Model Jury Instructions, Criminal, No. 8.20 (2015 rev.); 18 U.S.C. § 2339B(a).

   "Material support or resources" include "personnel," which can include defendants themselves.  See 18 U.S.C. §§ 2339A(b)(1), 2339B(g)(4).

   The definition of a conspiracy is set forth in Ninth Circuit Model Criminal Jury Instructions Number 8.20, which provides:

> A conspiracy is a kind of criminal partnership — an agreement of two or more persons to commit one or more crimes.  The crime of conspiracy is the agreement to do something unlawful; it does not matter whether the crime agreed upon was committed.
>
> For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy.  It is not enough, however, that they simply met, discussed matters

5

of common interest, acted in similar ways, or perhaps helped one another.  You must find that there was a plan to provide material support or resources to a designated foreign terrorist organization as the object of the conspiracy with all of you agreeing as to the particular crime which the conspirators agreed to commit.

One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though the person does not have full knowledge of all the details of the conspiracy. Furthermore, one who willfully joins an existing conspiracy is as responsible for it as the originators. On the other hand, one who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator.  Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists.

See Ninth Circuit Model Jury Instructions, Criminal, No. 8.20 (2015 rev.).

The Ninth Circuit Model Criminal Jury Instructions also provides the following instruction on defendants' knowledge and association with other members of the conspiracy:

A conspiracy may continue for a long period of time and may include the performance of many transactions.  It is not necessary that all members of the conspiracy join it at the same time, and one may become a member of a conspiracy without full knowledge of all the details of the unlawful scheme or the names, identities, or locations of all of the other members.

Even though a defendant did not directly conspire with other conspirators in the overall scheme, the defendant has, in effect, agreed to participate in the conspiracy if the government proves each of the following beyond a reasonable doubt that:

(1) the defendant directly conspired with one or more conspirators to carry out at least one of the objects of the conspiracy;

(2) the defendant knew or had reason to know that other conspirators were involved with those with whom the defendant directly conspired; and

6

(3) the defendant had reason to believe that whatever benefits the defendant might get from the conspiracy were probably dependent upon the success of the entire venture.

It is not a defense that a person's participation in a conspiracy was minor or for a short period of time.

See Ninth Circuit Model Jury Instructions, Criminal, No. 8.23 (2010 ed.).

In order for an organization to qualify as a "foreign terrorist organization," the organization must have been designated as such through a process established by under Section 219 of the Immigration and Nationality Act.[2]    18 U.S.C. § 2339B(g)(6).

---

[2]  As discussed more fully in the government's motion in limine to preclude challenge to the validity of the Secretary of State's designation of the Islamic State of Iraq and the Levant as a foreign terrorist organization (CR 104), the terrorist organization now broadly known as the Islamic State of Iraq and the Levant ("ISIL"), or the Islamic State in Iraq and Syria ("ISIS"), has been continuously designated by the Secretary of State as a foreign terrorist organization at least since on or about May 15, 2014.
In fact, ISIL was first designated as a foreign terrorist organization by the Secretary of State on or about October 8, 2004, when ISIL was called Jam'at al Tawhid wa'al-Jihad as a foreign Fed. Register Doc. 04-23173.  On or about December 15, 2004, the Secretary of State declared, after a finding of a sufficient factual basis, that, inter alia, al-Qa'ida in Iraq was an alias of Jam'at al Tawhid wa'al-Jihad, a designated foreign terrorist organization. Fed. Register Doc. 04-27799.  On or about January 11, 2012, the Secretary of State declared, after a finding of a sufficient factual basis, that Islamic State of Iraq was an alias of al-Qa'ida in Iraq, a designated foreign terrorist organization.  Fed. Register Doc. 2012-1538.  On or about May 15, 2014, the Secretary of State declared, after a finding of a sufficient factual basis, that, inter alia, the ISIL, the ISIS, and Daesh were aliases of al-Qa'ida in Iraq, a designated foreign terrorist organization.  Fed. Register Doc. 2014-11210.  On or about September 30, 2015, the Secretary of State determined, after a finding of a sufficient factual basis, that, inter alia, Islamic State, and the acronyms "ISIL" and "ISIS," were aliases of ISIL, a designated foreign terrorist organization. Fed. Register Doc. 2015-24893.
Identification of additional aliases has not altered the foreign terrorist organization designation for this same group, which now is broadly called ISIL or ISIS.  Thus, as indicated in Counts One, Two, and Three of the FSI, ISIL – also known as ISIS,

7

Pursuant to 8 U.S.C. § 1189, the Secretary of State is authorized to designate an organization as a foreign terrorist organization, if the Secretary finds that (1) the organization is a foreign organization, (2) the organization engages in terrorist activity, terrorism, or retains the capability and intent to engage in terrorist activity or terrorism, and (3) the terrorist activity or terrorism of the organization threatens the security of United States nationals or the national security of the United States.  8 U.S.C. § 1189(a)(1).

The term "terrorist activity" includes any activity that, if it had been committed in the United States, would be unlawful under the laws of the United States or any state and that involves, inter alia, a threat, attempt, or conspiracy to use any "explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property."  8 U.S.C. § 1182(a)(3)(B).

The term "terrorism" means "premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents."  22 U.S.C. § 2656f(d)(2).

**B.    Count Two: 18 U.S.C. § 2339B (Attempt to Provide Material Support to a Foreign Terrorist Organization)**

The elements of Attempt to Provide Material Support to a Designated Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B, as alleged in Count Two of the FSI, are:

---

al-Qa'ida in Iraq, and the Islamic State – has been continuously designated by the Secretary of State as a foreign terrorist organization at least since on or about May 15, 2014.  (CR 41.)

8

> First, the defendant intended to provide material support or resources to a foreign terrorist organization; and
>
> Second, the defendant did something that was a substantial step toward committing the crime of providing material support or resources to a foreign terrorist organization.
>
> Mere preparation is not a substantial step toward committing the crime.  To constitute a substantial step, a defendant's act or actions must demonstrate that the crime will take place unless interrupted by independent circumstances.

See Ninth Circuit Model Jury Instructions, Criminal, No. 8.20 (2010 ed.); 18 U.S.C. § 2339B(a).

**C.** **Count Three: 18 U.S.C. §§ 2339B, 2 (Aiding and Abetting an Attempt to Provide Material Support to a Foreign Terrorist Organization)**

The elements of Aiding and Abetting an Attempt to Provide Material Support to a Foreign Terrorist Organization, in violation of 18 U.S.C. §§ 2339B, 2, as alleged in Count Three of the FSI, are:

> First, the crime of attempting to provide material support or resources to a designated foreign terrorist organization was committed by someone;
>
> Second, the defendant aided, counseled, commanded, induced or procured that person with respect to at least one element of the attempt to provide material support or resources to a designated foreign terrorist organization;
>
> Third, the defendant acted with the intent to facilitate the attempt to provide material support or resources to a designated foreign terrorist organization; and
>
> Fourth, the defendant acted before the crime was completed.

See Ninth Circuit Model Jury Instructions, Criminal, No. 5.1 (2015 rev.); 18 U.S.C. §§ 2339B(a).

A defendant may be found guilty of attempting to provide material support or resources to a designated foreign terrorist organization, even if the defendant personally did not commit the act or acts constituting the crime but aided and abetted in its

9

commission.  See Ninth Circuit Model Jury Instructions, Criminal, No. 5.1 (2015 rev.).

It is not enough that the defendant merely associated with the person committing the crime, or unknowingly or unintentionally did things that were helpful to that person, or was present at the scene of the crime.  The evidence must show beyond a reasonable doubt that the defendant acted with the knowledge and intention of helping that person commit attempting to provide material support or resources to a designated foreign terrorist organization.  Id.

A defendant acts with the intent to facilitate the crime when the defendant actively participates in a criminal venture with advance knowledge of the crime.  The government is not required to prove precisely which defendant actually committed the crime and which defendant aided and abetted.  Id.

**D.    Count Four Through Twenty-Nine: 18 U.S.C. §§ 1344, 2 (Bank Fraud)**

The elements of Bank Fraud, in violation of 18 U.S.C. § 1344, as alleged in Count Four through Twenty-Nine of the FSI, are:

First, the defendant knowingly executed a scheme to defraud a financial institution as to a material matter;

Second, the defendant did so with the intent to defraud the financial institution; and

Third, the financial institution was insured by the Federal Deposit Insurance Corporation ("FDIC").

See Ninth Circuit Model Jury Instructions, Criminal, No. 8.125 (2015 rev.); United States v. Shaw, 781 F.3d 1130, 1133 (9th Cir. 2015).

The phrase "scheme to defraud" means any deliberate plan of action or course of conduct by which someone intends to deceive, cheat, or deprive a financial institution of something of value.  An

intent to defraud is an intent to deceive or cheat. It is not necessary for the government to prove that a financial institution was the only or sole victim of the scheme to defraud. It is also not necessary for the government to prove that the defendant was actually successful in defrauding any financial institution. Finally, it is not necessary for the government to prove that any financial institution lost any money or property as a result of the scheme to defraud. See Ninth Circuit Model Jury Instructions, Criminal, No. 8.125 (2015 rev.).

The government must prove that the financial institution at issue was insured at the time of the offense by the FDIC. See United States v. Chapel, 41 F.3d 1338, 1340-41 (9th Cir. 1994). Like any other element of the offense, federal insurance may be proven by circumstantial evidence. United States v. Bellucci, 995 F.2d 157, 160 (9th Cir. 1993). A certificate of insurance by the FDIC or un-contradicted testimony of an officer of the financial institution concerning its insured status is sufficient to establish that the institution is federally insured. Id.

A defendant may be found guilty of bank fraud, even if the defendant personally did not commit the act or acts constituting the crime, but aided and abetted in its commission. To prove a defendant guilty of aiding and abetting bank fraud, the government must prove beyond a reasonable doubt:

First, bank fraud was committed by someone;

Second, the defendant knowingly and intentionally aided, counseled, commanded, induced or procured that person to commit at least one element of bank fraud;

Third, the defendant acted with the intent to facilitate bank fraud; and

11

Fourth, the defendant acted before the crime was completed.

It is not enough that the defendant merely associated with the person committing the crime, or unknowingly or unintentionally did things that were helpful to that person, or was present at the scene of the crime.  The evidence must show beyond a reasonable doubt that the defendant acted with the knowledge and intention of helping that person commit bank fraud.

A defendant acts with the intent to facilitate the crime when the defendant actively participates in a criminal venture with advance knowledge of the crime.

The government is not required to prove precisely which defendant actually committed the crime and which defendant aided and abetted.

See Ninth Circuit Model Jury Instructions, Criminal, No. 5.1 (2015 rev.)

Aiding and abetting is not a separate and distinct offense from the underlying substantive crime, but is a different theory of liability for the same offense.  United States v. Garcia, 400 F.3d 816, 820 (9th Cir. 2005).  An aiding and abetting instruction is proper even when the indictment does not specifically charge that theory of liability, because all indictments are read as implying that theory in each count.  United States v. Vaandering, 50 F.3d 696, 702 (9th Cir. 1995).

In addition, under 18 U.S.C. § 2(b), a person who, with the requisite intent, "causes" another to commit a criminal act is liable for that act as if he had committed it personally.  See United States v. Gleason, 616 F.2d 2, 20 (2d Cir. 1979).  As used in § 2(b), the word "cause" has a broad application; it means not only to act through an intermediary, but also more generally to procure or bring about the commission of a crime.  See United States v. Markee, 425 F.2d 1043, 1046 (9th Cir. 1970); United States v. Inciso, 292 F.2d 374, 378 (7th Cir. 1961).  A person who willfully

12

does or fails to do something which, in the ordinary course, would result in another person doing something the law forbids, is responsible for "causing" the act. <u>Pereira v. United States</u>, 347 U.S. 1 (1954). As the legislative history of § 2 makes clear, § 2(b) was added to the statute to "remove [] all doubt that one who puts in motion or assists in the illegal enterprise . . . is guilty as a principal even though he intentionally refrained from the direct act constituting the completed offense." 1948 Revisor's Note. <u>See also</u> <u>United States v. Causey</u>, 835 F.2d 1289, 1292 (9th Cir. 1987). A person who causes another to commit a criminal act is guilty as a principal under § 2(b), regardless of the culpability of the party actually committing the act. <u>See</u> <u>Causey</u>, 835 F.2d at 1292. In particular, a person who causes another to commit a criminal act is guilty as a principal under § 2(b) even if the party actually committing the criminal act lacked the required intent to himself be guilty of the crime. <u>Id.</u>

**E.   <u>Count Five: 20 U.S.C. § 1097(a) (Financial Aid Fraud)</u>**

The elements of Financial Aid Fraud, in violation of 20 U.S.C. § 1097(a), as alleged in Count Thirty of the FSI, are:

First, the defendant misapplied federal Pell Grant funds;

Second, the amount of the federal Pell Grant funds exceeded $200;

Third, the defendant did so knowingly and willfully, and

Fourth, the federal Pell Grant funds were provided and insured under subchapter IV of Chapter 28 of United States Code Title 20 or part C of subchapter I of chapter 34 of United States Code Title 42.

<u>See</u> 20 U.S.C. §§ 1097(a), 1070, 1070a; <u>United States v. Bailie</u>, 99 F.3d 1147, *1-*4 & n.1 (9th Cir. 1996) (unpublished).

13

Federal Pell Grant funds are provided and insured under subchapter IV of Chapter 28 of United States Code Title 20.  20 U.S.C. §§ 1070, 1070a.

The word "willfully" means that the defendant committed the act voluntarily and purposely, and with knowledge that his conduct was unlawful.  Bryan v. United States, 524 U.S. 184, 189-91, 193-96, 198-99 (1998); United States v. Awad, 551 F.3d 930, 937-41 (9th Cir. 2009) (discussing willfulness in context of 18 U.S.C. § 1347).

A specific intent to injure or defraud someone, whether the United States or another, is not required for a conviction based on the misapplication of federal Pell Grant funds.  Bates v. United States, 522 U.S. 23, 25 (1997) (holding "that specific intent to injure or defraud someone, whether the United States or another, is not an element of the misapplication of funds proscribed by § 1097(s)).

**IV.  CRIMINAL FORFEITURE**

The forfeiture allegation of the FSI provides notice to defendant Elhuzayel that, if he is convicted of any of the bank fraud offenses as alleged in Counts Four through Twenty-Nine of the FSI, in violation of 18 U.S.C. § 1344, he shall forfeit to the United States any property which constitutes or is derived from proceeds traceable to said violations.  (CR 41.)  If such property is not available, defendant Elhuzayel shall forfeit to the United States a sum of money equal to the total value of the property. (Id.)  This forfeiture allegation is based on 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

Section 981(a)(1)(C) is a civil forfeiture statute and does not provide set out forfeiture procedures in a criminal case; however,

14

§ 2461(c) provides for criminal forfeiture in all cases where civil forfeiture is authorized and no procedures are provided, and incorporates by reference the procedures from 21 U.S.C. § 853.  In addition, Rule 32.2 of the Federal Rules of Criminal Procedure provides the basic procedural framework for the determination and entry of a judgment of forfeiture in a criminal case.[3]

### A.   Notice to Defendants

Pursuant to Federal Rules of Criminal Procedure 7(c)(2) and 32.2(a), the FSI puts defendant Elhuzayel on notice that the government seeks forfeiture of property in the event defendant Elhuzayel is convicted of bank fraud.  The FSI seeks forfeiture of all property which constitutes or is derived from proceeds defendants obtained from the fraud.  (CR 41.)  See 18 U.S.C. § 981(a)(1)(C).

### B.   Forfeiture Proceeding: Role of Court and Jury

Where the government seeks forfeiture of a defendant's property as a consequence of the defendant's conviction, the court must conduct a proceeding to determine the forfeitability of the property "as soon as practicable" after a verdict or finding of guilty.  Fed. R. Crim. P. 32.2(b)(1).  During the forfeiture phase of the trial:

> If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense.  If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay.

Id.

---

[3] To date, defendant Elhuzayel has not indicated whether he intends to contest the forfeiture allegation and whether he would seek a jury trial on the forfeiture allegation.

15

There is no constitutional right to trial by jury on forfeiture issues.  See <u>Libretti v. United States</u>, 516 U.S. 29, 49 (1995) (because forfeiture is part of sentencing, the Sixth Amendment does not require a jury determination); <u>see also</u> <u>United States v. Vera</u>, 278 F.3d 672, 673 (7th Cir. 2002) (holding that <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), does not disturb the rule that forfeiture may be decided by the judge on a preponderance standard; noting that criminal forfeiture has no prescribed statutory maximum).  Accordingly, Rule 32.2 governs the jury's role.

Where the guilty verdict was returned by a jury, and where the government seeks forfeiture of specific property, a defendant may request that the jury be retained to determine the "requisite nexus" between the specific property and the offense.  Fed. R. Crim. P. 32.2(b)(5).  However, no parallel provision exists for determination of the amount of a money judgment.  Instead, the Rule provides that "if the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay."  Fed. R. Crim. P. 32.2(b)(1).

Therefore, to the extent that the government seeks personal money judgments against defendants, the Court is to determine the amount of money defendant Elhuzayel should be ordered to pay in forfeiture.  <u>United States v. Tedder</u>, 403 F.3d 836, 840-41 (7th Cir. 2005) (employing same reasoning above to conclude there is no right to a jury trial on the amount of a money judgment).  As the determination is to be made by the Court, it need not occur immediately, but instead may be made at a separate proceeding at or prior to sentencing.

## C.    **Standard of Proof**

Forfeiture is an element of the sentence on a count of conviction, not a substantive offense.  See Libretti, 516 U.S. at 49.  Accordingly, the forfeitability of property or the amount of a money judgment must be proved by a preponderance of the evidence.  See, e.g., United States v. Garcia-Guizar, 160 F.3d 511, 518 (9th Cir. 1998) (preponderance standard is constitutional because criminal forfeiture is not a separate offense, but only an additional penalty for an offense that was established beyond a reasonable doubt); United States v. Dicter, 198 F.3d 1284, 1289 (11th Cir. 1999) (because forfeiture is part of sentencing, preponderance standard applies).

Here, the government anticipates that during the forfeiture phase it will rely primarily on the evidence already presented during the guilt phase, because much of the evidence probative of guilt also supports forfeiture.  To the extent it deems necessary, the government may present additional evidence pertaining to forfeiture during the forfeiture phase.  The defendants may also present evidence during the forfeiture phase, which the government may seek to rebut just as in the guilt phase.  Fed. R. Crim. P. 32.2(b)(1)(B) ("The court's determination may be based on evidence already in the record . . . . If the forfeiture is contested, on either party's request the court must conduct a hearing after the verdict or a finding of guilty.").

## D.    **Third Party Interests**

The determination of the amount defendant Elhuzayel is ordered to pay will serve as the basis for the Court to enter a preliminary order of forfeiture.  Fed. R. Crim. P. 32.2(b)(2), (3).  To the

17

extent that the government locates or identifies specific forfeitable property after entry of the preliminary order of forfeiture (see Rule 32.2(e)(1)(A)), the extent of defendant Elhuzayel's interests in such property vis-à-vis third parties is litigated separately in an "ancillary proceeding." Fed. R. Crim. P. 32.2(e)(2)(B). In such a proceeding, the Court (without a jury) will decide the claims of any third parties who assert interests in specific property to be forfeited. 21 U.S.C. § 853(n)(2). There is no ancillary proceeding to the extent the forfeiture order consist of a money judgment. Fed. R. Crim. P. 32.2(c)(1).

**IV. GOVERNMENT'S OFFER OF PROOF**

At trial, the United States intends to prove the following facts, among others:

Defendant Badawi maintained a Facebook account on which there were public postings supporting the ISIS, violent jihad, martyrdom, and violence against "kaffirs" (non-believers). On July 15, 2014, defendant Badawi, via his Facebook account, stated, "We should going [sic] Isis in Iraq and Syria," "Check their youtube videos," and "They're jihadist." On July 23, 2014, defendant Badawi, via his Facebook account, stated that he might join ISIS in the future. On October 3, 2014, defendant Badawi, via his Facebook account, stated, "May Allah give victory to the mujahideen in Iraq and Syria and all part [sic] of the world."

On October 13, 2014, defendant Elhuzayel created a Facebook account and used the ISIS flag as his profile picture. On October 14, 2014, through his Facebook account, defendant Elhuzayel urged Allah to grant him martyrdom and the success to leave this country and fight for his cause – "Oh [A]llah, destroy your enemies and give

18

the Islamic [S]tate victory."  Defendant Elhuzayel also created and used additional social media accounts to communicate about ISIS with others who had joined, aspired to join, or supported ISIS. Defendant Elhuzayel also used his social media accounts to disseminate pro-ISIS information and to assist ISIS supporters to have current contact information about each other.

On October 21, 2014, defendant Badawi made a video of defendant Elhuzayel in which defendant Elhuzayel swore allegiance to the leader of ISIS, Abu Bakr al-Baghdadi, and pledged to travel to Syria to be an ISIS fighter.  The video reflects that when defendant Elhuzayel made these pledges, defendant Badawi stated "Ameen," indicating his commitment that the pledges be fulfilled.

In November 2014, on his Twitter account @darrulislam, defendant Badawi posted, "Inshallah [God willing] soon the Islamic state will take over Baghdad ya musilmeen [oh Muslims]."  On November 20, 2014, defendant Badawi, via his Facebook account, stated, "It's time for jihad," and posted a photo of men being held down with knives at their throats.

In December 2014, in an Internet communication, defendant Elhuzayel described ISIS attacking Israel, saying that he was "looking forward to see some yahoodi heads rolling, or dead bodies carrying their own yahoodi heads, and jihadi john doing this stance on them."  Defendant Elhuzayel attached a link to a picture of a man lying on his stomach, and another man, "Jihadi John," sitting on top of the man holding the prone man's head back, displaying the man's severed neck and a bloody knife.  ("Jihadi John" is the name given to the ISIS fighter who held certain Western hostages captive in

2014.  In video releases, this individual was depicted beheading multiple victims.)[4]

In February 2015, defendant Badawi posted on Twitter a tweet from another user, "Islamic State steps up #Libya attacks, targets Iran ambassador #BombAttacks #Iranian/Ambassador #Islamic State." This posting included updates of ISIS's battles.

On or about March 23, 2015, defendant Badawi received in his HigherOne bank account a deposit of $2,865, which was a dispersal of a portion of his federal Pell Grant funds.

Beginning on or about April 4, 2015, to finance his travel to Syria to join ISIS, defendant Elhuzayel began to commit bank fraud. Defendant Elhuzayel deposited stolen checks to his bank accounts and withdrew cash before the banks determined the deposited checks were fraudulent.

On April 24, 2015, in a telephone conversation, defendants discussed how it would be such a blessing to fight for the cause of Allah and to die in the battlefield.  Defendant Badawi said, "May Allah grant us victory."  Defendant Badawi also said that he wanted ISIS to gain a lot of territories, that he was impatient, and that he wanted victory "so bad."  Defendant Badawi stated further that ISIS had new people joining their army.  Defendant Elhuzayel responded, "Allah make us among them," and defendant Badawi answered, "Amen.  Amen."

---

[4] The government does not intend to introduce at trial videos that depict beheadings.  The government does intend to introduce at trial photographs of beheadings and other violent acts that were in defendants' possession, and in many instances, were disseminated by defendants.  In some cases, these photographs came from videos, and in those instances, the government may elicit testimony about those videos.

In May 2015, defendant Badawi posted on Twitter a link to the 2014 speech by Abu Bakr al-Baghdadi, the leader of ISIS.  In the speech, al-Baghdadi encouraged attacks against Yemen, Egypt, Libya, and Algeria, and stated, "Oh soldiers of the Islamic State . . . erupt volcanoes of jihad everywhere."

On May 3, 2015, in a recorded telephone conversation, co-defendant Elhuzayel said to defendant Badawi, "May we be united in the Islamic State," and Badawi responded, "Amen."

On May 7, 2015, defendants took action.  While together, defendant Badawi purchased for defendant Elhuzayel a one-way airline ticket on Turkish Airlines for travel on May 21, 2015, from Los Angeles International Airport ("LAX") to Tel Aviv, Israel, with an approximately six-hour layover in Istanbul, Turkey.  Defendant Badawi paid for this ticket by using his HigherOne debit card to access the federal Pell Grant funds that had been deposited previously into his HigherOne account.  Defendant Badawi had obtained these Pell Grant funds by submitting an application on which he had certified that he would use the funds *only to pay the cost of attending an institution of higher education."*  Defendant Badawi never replenished these funds in his HigherOne account.

In a recorded conversation on May 9, 2015, defendant Elhuzayel told defendant Badawi that they would meet up in the "Islamic State," referring to ISIS's territory, and later in the same conversation defendant Elhuzayel said, "may Allah grant us Shaheed [martyrdom]."  In recorded conversations on May 10, 2015, defendant Badawi advised defendant Elhuzayel that he should go to the "Islamic State" in Egypt, referring to ISIS's territory there.  Defendant Elhuzayel asked defendant Badawi if he could imagine being with

21

"that army," to which defendant Badawi answered, "Yeah."  Defendant Elhuzayel said in response, "Mujahideen."

On May 21, 2015, defendant Elhuzayel arrived at LAX.  He carried his U.S. passport, $1,016 in U.S. currency, a new iPhone 6, and luggage that contained clothing, a laptop computer, a new LG G-Pad computer tablet, a new Vtech "Magic Jack" telephone, a new portable phone charger, and a USB drive.  Defendant Elhuzayel was arrested by Federal Bureau of Investigation ("FBI") Special Agents at LAX after passing through security screening.

After his arrest on May 21, 2015, defendant Elhuzayel made several admissions to FBI Special Agents.  Defendant Elhuzayel said that he knew that ISIS fighters raped and killed people, that they engaged in terrorist actions, and that they were considered to be terrorists.  Defendant Elhuzayel said that although the ultimate destination on his itinerary was Tel Aviv, he planned to fly only to Istanbul, Turkey, and then contact someone in ISIS to obtain assistance to cross the border into Syria where he would join ISIS.  Defendant Elhuzayel said that he had stated his allegiance to the leader of ISIS, and that he knew he would have to obey him once he was with ISIS.

Defendant Badawi was also arrested on May 21, 2015 – separately from defendant Elhuzayel.  After his arrest, defendant Badawi made several admissions to FBI Special Agents.  Defendant Badawi admitted that he knew defendant Elhuzayel had wanted to join ISIS since July or August 2014, after ISIS announced a new Caliphate.  Defendant Badawi admitted that defendant Elhuzayel had told him that he wanted to buy a plane ticket to Palestine, and then join ISIS.  Defendant Badawi admitted that he and defendant Elhuzayel used defendant

Badawi's card to purchase the ticket, and defendant Elhuzayel re-paid defendant Badawi immediately with cash.[5]  Defendant Badawi admitted that ISIS's goal was to expand to neighboring countries such as Jordan and Palestine, and the purpose for ISIS's beheading of people was to "put terror in enemies."

**V.    EVIDENTIARY AND LEGAL ISSUES**

    **A.    Exhibits**

At trial, the government intends to introduce various types of evidence, including: audio and video recordings; transcripts of recordings, including translations from foreign language; screen captures from the Internet and defendants' social media accounts, including Facebook and Twitter, and items posted or linked to those accounts; digital data from a thumb drive and a cellular phones; Facebook messages, e-mails, text messages, and other electronic messaging; photographs and videos; physical evidence; and business and public records.

Authentication of trial exhibits is generally a matter for the jury.  See Fed. R. Evid. 104(b) and 901(a).  The Federal Rules of Evidence treat authenticity and identification under Rule 901 as simply "a special aspect of relevancy."  Fed. R. Evid. 901(a) (Advisory Committee Notes).  Under Rule 901, the condition or fact to be satisfied is whether there is sufficient evidence that the item proffered is what the proponent claims.  See United States v. Whitworth, 856 F.2d 1268, 1283 (9th Cir. 1989).  When proffered evidence is challenged on grounds of authenticity or identification,

---

[5] To avoid Bruton error, the government does not intend to seek to admit at trial defendant Badawi's post-arrest statements about defendant Elhuzayel's conduct.

the evidence should be admitted once the government makes a prima facie showing of authenticity.  See United States v. Black, 767 F.2d 1334, 1342 (9th Cir. 1985).

As stated in Black, the trial judge's decision is simply whether "sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification."  Id. The credibility or probative force of the evidence offered is, ultimately, an issue for the jury.  See id. (citing 5 J. Weinstein & M. Berger, Weinstein's Evidence, § 901(a)(1), at 901-17 (1983)).  As these Rules establish, the requirement of authentication prior to admissibility "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." See United States v. Salcido, 506 F.3d 729, 733 (9th Cir. 2011) (government properly authenticated videos and images under Rule 901 by presenting detailed evidence as to chain of custody, specifically how images were retrieved from defendant's computers).

### 1.   Audio and Video Recordings

At trial, the government expects to introduce numerous audio recordings of defendants in which they discuss, among other things, their intention to travel overseas to join ISIS and become fighters for ISIS.  In addition, the government expects to introduce two video recordings in which defendant Badawi interviews defendant Elhuzayel about ISIS, and excerpts from video recordings of defendants' post-arrest interviews with FBI Special Agents.

//

//

//

//

24

All duly admitted recorded conversations must be played in open court.[6] The foundation that must be laid for the introduction into evidence of recorded conversations is a matter largely within the discretion of the trial court. There is no rigid set of foundational requirements. Rather, the Ninth Circuit has held that recordings are sufficiently authenticated under Fed. R. Evid. 901(a) if sufficient proof has been introduced "so that a reasonable juror could find in favor of authenticity or identification," which can be done by "proving a connection between the evidence and the party against whom the evidence is admitted" and established by both direct and circumstantial evidence. United States v. Matta-Ballesteros, 71 F.3d 754, 768 (9th Cir. 1995), modified by 98 F.3d 1100 (9th Cir. 1996).

Witnesses may testify competently as to the identification of a voice on a recording. A witness's opinion testimony in this regard may be based upon his having heard the voice on another occasion under circumstances connecting it with the alleged speaker. See Fed. R. Evid. 901(b)(5); United States v. Torres, 908 F.2d 1417, 1425 (9th Cir. 1990) ("Testimony of voice recognition constitutes sufficient authentication."). The Ninth Circuit has further explained that "Rule 901(b)(5) establishes a low threshold for voice identifications offered to determine the admissibility of recorded conversations," and that "[s]o long as the identifying witness is 'minimally familiar' with the voice he identifies, Rule 901(b) is

---

[6] Allowing jurors to take into the jury deliberation room recorded conversations that were not played in open court is structural error requiring automatic reversal if a defendant objects to allowing the jurors to have the un-played recordings in the jury room. United States v. Noushfar, 78 F.3d 1442, 1444-45 (9th Cir. 1996).

satisfied."  See United States v. Plunk, 153 F.3d 1011, 1022-23 (9th Cir. 1998), overruled on other grounds by United States v. Hankey, 203 F.3d 1160, 1169 n.7 (9th Cir. 2000).  "Attacks on the accuracy of the identification go to the weight of the evidence, and the issue is for the jury to decide."  United States v. Cerone, 830 F.2d 938, 949 (8th Cir. 1987).

Recorded conversations are competent evidence even when they are partly inaudible, unless the unintelligible portions are so substantial as to render the recording as a whole untrustworthy.  United States v. Rrapi, 175 F.3d 742, 746 (9th Cir. 1999).  A lay witness may explain unfamiliar terms contained in a recorded conversation, even when such matters are central to the facts at issue.  Fed. R. Evid. 701; United States v. Freeman, 498 F.3d 893, 904-05 (9th Cir. 2007).

The recordings contain out-of-court statements by defendants.  As the government argued more fully in its motion in limine to preclude defendants from introducing their own hearsay statements (CR 115), each defendant's statements are admissible only if offered against him; neither defendant may elicit his own prior statements.  Fed. R. Evid. 801(d)(2)(A); United States v. Fernandez, 839 F.2d 639 (9th Cir. 1988).  When the government admits a portion of a defendant's prior statement, the defendant may not put in additional out-of-court statements by him because such statements are hearsay when offered by the defendant.  Fed. R. Evid. 801(d)(2); United States v. Ortega, 203 F.3d 675, 681-82 (9th Cir. 2000) (defendant prohibited from eliciting his own exculpatory statements during cross examination of government agent).  Further, it is entirely proper to admit segments of a recording and adverse parties are not

entitled to offer additional statements just because they were recorded and the proponent has not offered them, as long as the segments offered do not create a misleading impression. See United States v. Mitchell, 502 F.3d 931, 964 (9th Cir. 2007) (observing that a defendant's exculpatory statements made during interviews with law enforcement were hearsay outside any exception, and therefore properly excluded – notwithstanding the rule of completeness); see also United States v. Vallejos, 742 F.3d 902, 905 (9th Cir. 2014); United States v. Collicott, 92 F.3d 973, 983 (9th Cir. 1996).

> ### 2. Transcripts of Recordings: English and Foreign Languages

The government expects to present transcripts/translations of audio recordings at trial. Defendants have not stipulated to the authenticity or the admissibility of the audio and video recordings, or the transcripts/translations. The government, therefore, will offer testimony to establish the foundation for the authenticity and admissibility of the recordings and the transcripts/translations.

For recordings of statements made in English, the recording itself is the evidence and a transcript of the recording may be provided to the jury in open court on television monitors as an aid in following the conversation found on the recording. United States v. Chen, 754 F.2d 817, 824 (9th Cir. 1985); United States v. Phillips, 577 F.2d 495, 501 (9th Cir. 1978).

In this case, defendants often use Arabic words in their conversations, and in some instances, defendant Badawi speaks at length in Arabic or listens to recordings of someone speaking in Arabic. For recordings of statements in foreign language, namely,

27

Arabic in this case, the government will further establish the foundation for the accuracy, reliability, and admissibility of the English translations of the Arabic-language statements and move the translations transcripts into evidence.  Because defendants speak in both English and Arabic in their conversations, the translations of the Arabic words, phrases, and sentences are contained within the transcripts, together with the English-language statements.  The government will play the recorded conversations while displaying the transcripts, which contain the admitted translations, on courtroom television monitors for the jurors.

In cases involving audio recordings of foreign language conversations, the transcript containing the English translation is deemed to be the best evidence of the conversations.  United States v. Fuentes-Montijo, 68 F.3d 352, 355-56 (9th Cir. 1995). Accordingly, the transcript of the English translation is properly admitted into evidence, not the recorded conversation.  Id.; see also United States v. Noushfar, 78 F.3d 1442 (9th Cir. 1996).  A printed copy of each admitted transcript will thus be part of the evidence available to the jury during deliberations.

A trial court may admit English translations as long as the proper foundation is laid and the proper instructions are provided to the jury.  United States v. Armijo, 5 F.3d 1229 (9th Cir. 1993). The foundational requirements for the admission of foreign language transcripts are left to the discretion of the trial judge.  United States v. Turner, 528 F.2d 143, 168 (9th Cir. 1975).  Furthermore, the jury is not free to reject the accuracy of the interpretation of the recordings.  Fuentes-Montijo, 68 F.3d at 352.

### 3.    Physical Evidence

The government expects to introduce several items of physical evidence, including items seized from defendants' persons at the time of their arrests and items obtained from searches conducted pursuant to court-authorized search warrants.  As noted above, Rule 901(a) provides that, "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must provide evidence sufficient to support a finding that the item is what the proponent claims it is."  Accordingly, Rule 901(a) only requires the government to make a prima facie showing of authenticity or identification "so that a reasonable juror could find in favor of authenticity or identification."  United States v. Chu Kong Yin, 935 F.2d 990, 996 (9th Cir. 1991) (quoting United States v. Blackwood, 878 F.2d 1200, 1202 (9th Cir. 1989) (per curiam)).  The authenticity of proposed exhibits may be proven by circumstantial evidence.  See United States v. King, 472 F.2d 1, 9-11 (9th Cir. 1972).

To be admitted into evidence, a physical exhibit must be in substantially the same condition as when the crime was committed.  Fed. R. Evid. 901.  The Court may admit the evidence if there is a "reasonable probability the article has not been changed in important respects."  United States v. Harrington, 923 F.2d 1371, 1374 (9th Cir. 1991) (quoting Gallego v. United States, 276 F.2d 914, 917 (9th Cir. 1960)).  This determination is to be made by the trial judge and will not be overturned except for clear abuse of discretion.  Factors the Court may consider in making this determination include the nature of the item, the circumstances

surrounding its preservation, and the likelihood of intermeddlers having tampered with it.  Gallego, 276 F.2d at 917.

In establishing chain of custody as to an item of physical evidence, the government is not required to call all persons who may have come into contact with the piece of evidence.  Harrington, 923 F.2d at 1374.  Moreover, a presumption of regularity exists in the handling of exhibits by public officials.  Id.  Therefore, to the extent that alleged or actual gaps in the chain of custody exist, such gaps go to the weight of the evidence rather than to its admissibility.  Id.

4.    Internet Communications

Internet communications, including emails, web-based messages, and postings on various social media platforms, must, like other types of evidence, be authenticated "by evidence sufficient to support a finding that the matter in question is what its proponent claims."  Fed. R. Evid. 901(a).  Under Rule 901(b)(4), a document may be authenticated by "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances."  The government need only make a "prima facie showing of authenticity" such that "a reasonable juror could find in favor of authenticity or identification," and "establish a connection between the proffered evidence and the defendant." United States v. Tank, 200 F.3d 627, 630 (9th Cir. 2000) (internal quotation marks omitted) (court properly admitted transcript of Internet chat room discussion of child pornography).

Emails may be authenticated by a statement from the author or recipient, or by "the e-mail address from which it originated; comparison of the content to other evidence; and/or statements or

30

other communications from the purported author acknowledging the e-mail communication that is being authenticated." Fenje v. Feld, 301 F. Supp. 2d 781, 809 (N.D. Ill. 2003), aff'd, 398 F.3d 620 (7th Cir. 2005); see also United States v. Ruiz, 620 F. App'x 577, 578 (9th Cir. 2015) (unpublished) (affirming trial court's ruling that testimony by email recipient, agent, custodian of record of email service provider, and notes taken by witness's notebook provided sufficient basis for authentication of emails); United States v. Siddiqui, 235 F.3d 1318, 1322-23 (11th Cir. 2000) (email authenticated by address associated with defendant, testimony of party replying to email, and context of email). Cf. United States v. Masters, 613 F. App'x 618, 620 (9th Cir.), cert. denied, 136 S. Ct. 518 (2015) (affirming trial court's ruling that multiple references made to defendant and his email account in chat log authenticated the chat log).

Emails, text messages, web-based messages and chats, and social media postings may also be authenticated through "various traditional common law methods such as the reply doctrine, distinctive characteristics, chain of custody, or process and system." Graham, M., 7 Handbook of Federal Evidence § 901:9, Rule 901(b)(9): Process or System; Computer Records, Faxed Documents, E mail, Text Message, Web Site (available on Westlaw) (collecting cases). A party challenging the authenticity of email evidence bears the burden of submitting evidence to show that materials have been fabricated or modified. See Monte v. Ernst & Young, 330 F. Supp. 2d 350, 359 (S.D.N.Y. 2004).

### 5. Photographs and Videos

The government intends to introduce evidence of surveillance

31

photographs and video recordings of defendants in various locations separately and with each other. The government also intends to introduce evidence of photographs and video recordings found in defendants' digital devices and linked to defendants' emails, text messages, chats, and various social media platforms. Law enforcement agents either took the photos while on surveillance of defendants, or obtained the photos and videos through court-authorized collection. Witnesses will be able to confirm the dates, times, and methods of recording or collecting the photos and videos, as well as, when relevant, the locations of photos and videos, and any additional distinct characteristics pertaining to the items of evidence to establish authenticity.

Photographs are generally admissible as evidence. See United States v. Stearns, 550 F.2d 1167, 1171 (9th Cir. 1977) (affirming admission of photographs despite absence of direct testimony from any witness as to when or where photographs were taken, or what they represented). Photographs should be admitted so long as they fairly and accurately represent the event or object in question. United States v. Oaxaca, 569 F.2d 518, 525 (9th Cir. 1978). To authenticate a photograph, the government is not required to offer testimony from the person who took the photograph, or any specific person. See Stearns, 550 F.2d at 1171. Generally, photographic evidence may be authenticated under Rule 901(b)(1) by a witness who "identif[ies] the scene itself [in the photograph] and its coordinates in time and place." See Lucero v. Stewart, 892 F.2d 52, 55 (9th Cir. 1989) (internal quotation marks omitted); see also People of Territory of Guam v. Ojeda, 758 F.2d 403, 407 (9th Cir. 1985) (witness need only establish that photograph "is an accurate

portrayal"). Also, "[p]hotographs are admissible as substantive as well as illustrative evidence." United States v. May, 622 F.2d 1000, 1007 (9th Cir. 1980). Moreover, photographs can also be authenticated under Fed. R. Evid. 901(b)(9) through the "silent witness doctrine" by showing the process by which the photograph or video was made and that it was reliable. Mueller and Kirkpatrick, supra. Photographs can also be authenticated by content and circumstances under Fed. R. Evid. 902(b)(4). Stearns, 550 F.2d at 1171 (even where direct foundation testimony is lacking, contents of photograph itself, together circumstances or indirect evidence "may serve to explain and authenticate a photograph sufficiently"). "Photographs" include video recordings. Fed. R. Evid. 1001(2).

### 6. Business Records

The government intends to authenticate some of its documentary evidence by means of Rule 902(11), which permits self-authentication of business records. Specifically, on May 28, 2016, the government filed its notice of intent to offer evidence pursuant to Rule 902(11) of the Federal Rules of Evidence. (CR 129.)

A document is admissible as a business record if two foundational facts are established: (a) the document was made or transmitted by a person with knowledge at or near the time of the incident recorded, and (b) the document was kept in the course of a regularly conducted business activity. See Fed. R. Evid. 803(6); United States v. Ray, 930 F.2d 1368, 1370 (9th Cir. 1990); Kennedy v. Los Angeles Police Dep't, 901 F.2d 702, 717 (9th Cir. 1990). It is established that computer records are covered by this exception to the rule against hearsay. See, e.g., United States v. Catabran, 836 F.2d 453, 457-58 (9th Cir. 1988).

33

In determining if these foundational facts have been established, the court may consider hearsay and other evidence not admissible at trial, specifically business records declarations. See Fed. R. Evid. 104(a) and 1101(d)(1); Bourjaily v. United States, 483 U.S. 171, 178-179 (1987).  The foundation for business records may be established either through a custodian of records or "other qualified witness."  The phrase "other qualified witness" is broadly interpreted to require only that the witness understand the record keeping system.  See Ray, 930 F.2d at 1370; Childs, 5 F.3d at 1334. "There is no requirement that the government establish when and by whom the documents were prepared."  Ray, 930 F.2d at 1370; United States v. Huber, 772 F.2d 585, 591 (9th Cir. 1985) ("[T]here is no requirement that the government show precisely when the [record] was compiled.").

Records of regularly conducted activity that would be admissible under Rule 803(6) do not require extrinsic evidence of authenticity as a condition precedent to admissibility, if they are accompanied by a written declaration of a custodian of record certifying that the record: (1) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters; (2) was kept in the course of the regularly conducted activity; and (3) was made by the regularly conducted activity as a regular practice. Fed. R. Evid. 902(11).  As it has with defendants, the government has made the business records declarations available to the Court by means of its notice of intent to offer evidence pursuant to Rule 902(11).  (CR 129.)  The government will not be seeking to introduce those declarations as evidence and requests that the Court make the

34

determination as to admissibility of the pertinent trial exhibits pursuant to Rule 104(a).

### 7.    Public Records

Records and reports of public agencies setting forth matters observed pursuant to duty imposed by law as to which matters there was a duty to report are generally admissible as an exception to the hearsay rule.  See Fed. R. Evid. 803(8).  Certified copies of public records are self-authenticating documents.  See Fed. R. Evid. 902(4).  In other words, certified copies of public records do not require extrinsic evidence of authenticity as a condition precedent to admissibility.  Fed. R. Evid. 902(1), (4).

### 8.    Charts and Summaries

The government intends to elicit summary testimony using charts and summaries of the social media evidence and the audio recording evidence, among others.

A chart or summary may be admitted as evidence where the proponent establishes that the underlying documents are voluminous, admissible and available for inspection.  Fed. R. Evid. 1006; see United States v. Meyers, 847 F.2d 1408, 1411-1412 (9th Cir. 1988); United States v. Johnson, 594 F.2d 1253, 255-1257 (9th Cir. 1979). In addition, summary charts are admissible under Federal Rule of Evidence 611(a), which permits a court to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." United States v. Poschwatta, 829 F.2d 1477, 1481 (9th Cir. 1987); United States v. Gardner, 611

35

F.2d 770, 776 (9th Cir. 1980).  A chart summarizing unavailable documents is also admissible under Fed. R. Evid. 1004 if the underlying materials are "lost or destroyed" or "not obtainable." Fed. R. Evid. 1004(1) and 1004(2).

A summary witness may properly testify about, and use a chart to summarize, evidence that has already been admitted.  The court and jury are entitled to have a witness "organize and evaluate evidence which is factually complex and fragmentally revealed." United States v. Shirley, 884 F.2d 1130, 1133-34 (9th Cir. 1989) (agent's testimony regarding her review of various telephone records, rental receipts, and other previously offered testimony held to be proper summary evidence, as it helped jury organize and evaluate evidence; summary charts properly admitted); United States v. Lemire, 720 F.2d 1327, 1348 (D.C. Cir. 1983).  A summary witness may rely on the analysis of others.  Summary charts need not contain the defendant's version of the evidence and may be given to the jury while a government witness testifies concerning them.  See United States v. Radseck, 718 F.2d 233, 239 (7th Cir. 1983); Barsky v. United States, 339 F.2d 180, 181 (9th Cir. 1964).

### 9.  Duplicates

A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original, or (2) under the circumstances, it would be unfair to admit the duplicate instead of the original.  See Fed. R. Evid. 1003.  If the underlying documents are admitted in evidence, charts or summaries may be presented for the purpose of explaining facts disclosed by those documents.  Charts or summaries are not in and of themselves evidence or proof of any facts.  See Fed. R. Evid. 1006;

United States v. Catabran, 836 F.2d 453, 458 (9th Cir. 1988); Paddack v. Dave Christensen, Inc., 745 F.2d 1254, 1259 (9th Cir. 1984).

### B. Co-Conspirator Statements

Declarations by one co-conspirator during the course of and in furtherance of the conspiracy may be used against another conspirator because such declarations are not hearsay. See Fed. R. Evid. 801(d)(2)(E). Further, statements made in furtherance of a conspiracy were expressly held by the Supreme Court in Crawford v. Washington, 541 U.S. 36, 56 (2004) to be "not testimonial" such that their admission does not violate the Confrontation Clause. Thus, the admission of co-conspirator statements pursuant to Rule 801(d)(2)(E) requires only a foundation that: (1) the declaration was made during the life of the conspiracy; (2) it was made in furtherance of the conspiracy; and (3) there is, including the co-conspirator's declaration itself, sufficient proof of the existence of the conspiracy and of the defendant's connection to it. See Bourjaily v. United States, 483 U.S. 171, 173, 181 (1987).

The government must prove by a preponderance of the evidence that a statement is a co-conspirator declaration in order for the statement to be admissible under Fed. R. Evid. 801(d)(2)(E). Bourjaily, 483 U.S. at 176; United States v. Crespo de Llano, 838 F.2d 1006, 1017 (9th Cir. 1987). Whether the government has met its burden is to be determined by the trial judge, and not the jury. United States v. Zavala-Serra, 853 F.2d 1512, 1514 (9th Cir. 1988).

The trial court has discretion to determine whether the government may introduce co-conspirator declarations before establishing the conspiracy and the defendant's connection to it.

37

United States v. Loya, 807 F.2d 1483, 1490 (9th Cir. 1987).  It also has the discretion to vary the order of proof in admitting a co-conspirator's statement.  Id.  The court may allow the government to introduce co-conspirator declarations before laying the required foundation under the condition that the declarations will be stricken if the government fails ultimately to establish by independent evidence that the defendant was connected to the conspiracy.  Id.; see also United States v. Spawr Optical Research, Inc., 685 F.2d 1076, 1083 (9th Cir. 1982); Fleishman, 684 F.2d at 1338.

It is not necessary for the defendant to be present at the time a co-conspirator statement was made for it to be introduced as evidence against that defendant.  See Sendejas v. United States, 428 F.2d 1040, 1045 (9th Cir. 1970).  Rather, to be admissible under Fed. R. Evid. 801(d)(2)(E) as a statement made by a co-conspirator in furtherance of the conspiracy, a statement must "further the common objectives of the conspiracy," or "set in motion transactions that [are] an integral part of the [conspiracy]."  United States v. Arambula-Ruiz, 987 F.2d 599, 607-08 (9th Cir. 1993); United States v. Yarbrough, 852 F.2d 1522, 1535 (9th Cir. 1988).  Such statements are admissible whether or not they actually result in any benefit to the conspiracy.  Williams, 989 F.2d at 1068; United States v. Schmit, 881 F.2d 608, 612 (9th Cir. 1989).  Courts have interpreted the "in furtherance of" requirement broadly and have considered, among others, the following co-conspirator declarations as being made "in furtherance of the conspiracy":

- Statements made to keep a conspirator abreast of a co-conspirator's activity, to induce continued participation in a

38

conspiracy, or to allay the fears of a co-conspirator (United States v. Arias-Villanueva, 998 F.2d 1491, 1502 (9th Cir. 1993));

• Statements seeking to control damages to an ongoing conspiracy (Garlington v. O'Leary, 879 F.2d 277, 283 (7th Cir. 1989));

• Statements that refer to another conspirator as the boss, the overseer, or "sir" (United States v. Barnes, 604 F.2d 121, 157 (2d Cir. 1979)); and

• Statements that express "bragging," boasts, and other conversation designed to obtain the confidence, or allay the suspicions, of another conspirator (United States v. Santiago, 837 F.2d 1545, 1549 (11th Cir. 1988); United States v. Miller, 664 F.2d 94, 98 (5th Cir. 1981));

The co-conspirator statement also need not have been made exclusively, or even primarily, to further the conspiracy. Garlington v. O'Leary, 879 F.2d 277, 284 (7th Cir. 1989).

Furthermore, co-conspirator statements need not be made to a member of the conspiracy in order to be admissible under Rule 801(d)(2)(E). United States v. Zavala-Serra, 853 F.2d 1512, 1516 (9th Cir. 1988). Statements by persons acquitted of the same conspiracy may nonetheless be admitted under the co-conspirators' statement exception to the hearsay rule set forth in Fed. R. Evid. 801(d)(2)(E). See United States v. Peralta, 941 F.2d 1003, 1007 (9th Cir. 1991); see also United States v. Layton, 855 F.2d 1388, 1399-1400 (9th Cir. 1988) (finding statements made by a party to an agreement were admissible under Rule 801(d)(2)(E), notwithstanding the fact the venture could not be prosecuted as a criminal conspiracy because it had a lawful objective). A defendant,

however, cannot introduce statements made by his co-conspirators under the co-conspirator statement exception to the hearsay rule. See Fed. R. Evid. 801(d)(2)(E); United States v. Hackett, 638 F.2d 1179, 1187 (9th Cir. 1980)

### C.    Opinion Testimony of Law Enforcement Agent

An experienced government agent may provide opinion testimony even if that opinion is based in part on information from other agents familiar with the issue. United States v. Andersson, 813 F.2d 1450, 1458 (9th Cir. 1987); United States v. Golden, 532 F.2d 1244, 1248 (9th Cir. 1976). An experienced government agent may testify as to his opinions and impressions of what he observed. As the court in United States v. Skeet, 665 F.2d 983, 985 (9th Cir. 1982), stated:

> Opinions of non-experts may be admitted where the facts could not otherwise be adequately presented or described to the jury in such a way as to enable the jury to form an opinion or reach an intelligent conclusion. If it is impossible or difficult to reproduce the data observed by the witnesses, or the facts are difficult of explanation, or complex, or are of a combination of circumstances and appearances which cannot be adequately described and presented with the force and clearness as they appeared to the witness, the witness may state his impressions and opinions based upon what he observed.

Ultimately, opinion testimony by non-experts is "a means of conveying to the jury what the witness has seen or heard." Id.

Courts have admitted opinion testimony by law enforcement agents on a number of issues, such as: (1) the modus operandi of drug traffickers, United States v. Espinosa, 827 F.2d 604, 612 (9th Cir. 1987) (holding that district court properly admitted law enforcement officer's expert testimony on the modus operandi of narcotics traffickers, including use of "stash pads" for drugs);

40

(2) the use of guns by drug traffickers, United States v. Perez, 116 F.3d 840, 848 (9th Cir. 1997); and (3) a defendant's apparent attempt to avoid surveillance, Andersson, 813 F.2d at 1458.  An experienced narcotics agent's opinion testimony may be based in part on information from other agents familiar with the issue.  United States v. Beltran-Rios, 878 F.2d 1208, 1213 n.3 (9th Cir. 1989).

Further, under Ninth Circuit law, opinion testimony by law enforcement officers is not necessarily expert testimony within the meaning of Fed. R. Evid. 16(a)(1)(G).  In United States v. VonWillie, for instance, the Ninth Circuit held that the district court properly admitted testimony by a law enforcement agent that drug traffickers commonly used weapons "to protect their drugs and to intimidate buyers" as lay testimony.  59 F.3d 922, 929 (9th Cir. 1995).  The Court found that the officer's observations, based on his experience "during prior drug investigations" . . . "are common enough and require such a limited amount of expertise, if any, that they can, indeed, be deemed lay witness opinion."  Id.  Therefore, law enforcement opinion testimony should be admitted here, if offered by the government.

### D.    Expert Testimony

If specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact in issue, a qualified expert witness may provide opinion testimony on the issue in question.  Fed. R. Evid. 702.  Expert opinion may be based on hearsay or facts not in evidence, where the facts or data relied upon are of the type reasonably relied upon by experts in the field.  Fed. R. Evid. 703.  An expert may also provide opinion testimony even if it embraces an ultimate issue to be decided by the trier of

fact.  Fed. R. Evid. 704.

The government intends to call the following witnesses whose testimony will, at least in part, rely on their expertise, although only a few are expected to testify about an opinion:  Abdalla M. Ahmed, Patrick Bowens, William Braniff, Lena Grote, Terry G. Hom, Marisol Mendoza, Rohn Palmer, and Scott Wales.

Abdalla M. Ahmed is a linguist, whose native language is Sudanese Arabic.[7]  Mr. Ahmed works through a non-government translation service, and worked previously for several years as a translator for the United States military.  The government will call Mr. Ahemd as a foundational witness only, and anticipates that Mr. Ahmed will testify that the finalized English-language translations in this case are true and accurate translations of the underlying Arabic-language material, based on his review of the underlying foreign-language material, his consultation with dictionaries and other sources typically used by linguists, and his education, training, and experience.

Patrick Bowens is a Supervisory Special Agent ("SSA") with the FBI.  He is currently assigned to the FBI's Telecommunications Intercept and Collection Technology Unit ("TICTU").  The government will call SSA Bowens as a foundational witness only, and expect SSA Bowens to testify concerning the processes and procedures that the FBI follows to intercept communications from wireless telephones pursuant to court orders.

---

[7] Defendant Badawi's native language is Sudanese Arabic. Spoken Sudanese Arabic differs significantly from other forms of spoken Arabic.  Thus, Mr. Ahmed's native fluency in Sudanese Arabic was an important criterion in the selection by the government of a linguist in this case.

William Braniff is the executive director for the National Consortium for the Study of Terrorism and Response to Terrorism at the University of Maryland.  Prior to his current appointment, Mr. Braniff served as director of external education for the Combating Terrorism Center at the United States Military Academy at West Point.  Mr. Braniff's testimony is expected to include, but not be limited to: (1) the history, geo-political context, and various names, monikers, and acronyms of ISIS, also known as ISIL; (2) key terms, concepts, and phrases used in this context; (3) key leaders of ISIS and prominent individuals associated with ISIS; (4) the use of various social and Internet media and publications by ISIS and its followers; and (5) ISIS's recruitment activities, including the United States.  Mr. Braniff's testimony is necessary to enable the jury to understand the evidence in this case, including the significance and context of various names, organizations, terms, and practices that are contained in the evidence.

Lena Grote is an all-source intelligence analyst for CSRA's Homeland Security Group and currently on assignment with the Orange County Intelligence Assessment Center as the lead tactical intelligence analyst.  The government will call Ms. Grote as a foundational witness, and expects that she will testify about her capture and preservation of evidence from defendants' social media accounts.

Terry G. Hom is a digital device forensic examiner at the Orange County Regional Computer Forensics Laboratory.  The government will call Mr. Hom as a foundational witness, and expects Mr. Hom to testify about his examination of two digital devices

seized from defendants in this case, based on his education, training, and experience.

Marisol Mendoza is a Senior Institutional Review-audit Resolution and Eligibility Special with the U.S. Department of Education.  The government expects that Marisol Mendoza will testify about the Department of Education's administration of federal Pell Grants, including the application process and the restrictions on how the grants can be used.  Ms. Mendoza is expected to explain the application process for the Free Application for Federal Student Aid ("FAFSA"), and the evidence that defendant Badawi completed multiple FAFSA applications, each of which provided notice about the limitations on the use of federal student aid funds.  Ms. Mendoza is also expected to explain how Pell Grant funds, which are obtained through the submission of the FAFSA application, are distributed to eligible students and how students access those funds (i.e., through HigherOne bank accounts accessed through debit cards).

Rohn Palmer is an SSA with the FBI.  He is currently assigned to the FBI's Data Intercept Technology Unit ("DITU").  The government will call SSA Palmer as a foundational witness and expects SSA Palmer to testify concerning the processes and procedures that the FBI follows to conduct electronic surveillance on email, Internet, and other digital information pursuant to court authorization.

Scott Wales is a Special Agent with the FBI.  He is currently assigned to the Orange County Resident Agency ("OCRA") of the Los Angeles Field Office.  In OCRA, SA Wales works on the Joint Terrorism Task Force.  He is currently assigned to investigate Al-Qaeda and other Sunni-extremist groups who commit or conspire to

44

commit criminal acts.  The government expects that SA Wales will testify, in part, about his examination of the social media evidence in this case.  In particular, SA Wales is expected to testify about specific aspects of the social media evidence, such as profile photos, handles, tweets, re-tweets, and others.

### E.    Cross-Examination of Defendants

A defendant who testifies at trial waives his Fifth Amendment right against self-incrimination and subjects himself to cross-examination concerning all matters reasonably related to the subject matter of his testimony.  See, e.g., Ohler v. United States, 529 U.S. 753, 759 (2000) (citing McGautha v. California, 402 U.S. 183, 215 (1971), vacated in part on other grounds, 408 U.S. 941 (1972) ("It has long been held that a defendant who takes the stand in his own behalf cannot then claim the privilege against cross-examination on matters reasonably related to the subject matter of his direct examination")).  A defendant has no right to avoid cross-examination on matters which call into question his claim of innocence.  United States v. Miranda-Uriarte, 649 F.2d 1345, 1353-54 (9th Cir. 1981).

The scope of a defendant's waiver of the privilege is co-extensive with the scope of relevant cross-examination.  United States v. Cuozzo, 962 F.2d 945, 948 (9th Cir. 1992); United States v. Black, 767 F.2d 1334, 1341 (9th Cir. 1985) ("What the defendant actually discusses on direct does not determine the extent of permissible cross-examination or his waiver.  Rather, the inquiry is whether 'the government's questions are reasonably related' to the subjects covered by the defendant's testimony.").

//

//

**F.   Impeachment**

While Rule 607 of the Federal Rules of Evidence provides that the "credibility of a witness may be attacked by any party, including the party calling the witness," a party may not call a witness as a pretext for impeaching his credibility and thus present the jury with evidence that would be inadmissible but for the impeachment.  See United States v. Gomez-Gallardo, 915 F.3d 553, 555 (9th Cir. 1990) (holding that the government improperly called a witness "for the primary purpose of impeaching him"); United States v. Peterman, 841 F.2d 1474, 1479 n.3 (10th Cir. 1988) (noting that "[e]very circuit has said evidence that is inadmissible for substantive purposes may not be purposely introduced under the pretense of impeachment"); see also McCormick on Evidence; 1 McCormick on Evidence § 38 (7th ed. 2013) (parties may not "impeach a witness as a 'mere subterfuge' or for the 'primary purpose' of placing before the jury  substantive evidence which is otherwise inadmissible"); 27 Wright's Fed. Prac. & Proc. Evid § 6093, Rule 607, Who May Impeach a Witness, n.5 (2d ed. 2014) (explaining that Rule 607 relates to all means of attacking credibility, e.g., character, conviction, prior inconsistent statement, bias, and contradiction).

This exception to Rule 607, while most frequently raised by defendants to challenge impeachment by the government, also allows this Court to preclude the defense from impeaching its own witnesses.  See United States v. Libby, 475 F. Supp. 2d 73, 83-84 (D.D.C. 2007) (precluding the defense from calling reporter for sole purpose of impeaching her, where the "risk of the jury misusing the statement" . . . was "unduly prejudicial to the government.");

United States v. Lattin, 108 F.3d 1374 (4th Cir. 1997) (unpublished).  The policy underlying Rule 607 is the same policy that animates all of the relevance rules, which is to promote accurate fact-finding.  See Fed. R. Evid 102.  To ascertain whether a party is "simply calling a witness solely to impeach [him], many courts attempt to discern the primary purpose for the witness's testimony."  Libby, 475 F. Supp. 2d at 82 (citing United States v. Gilbert, 57 F.3d 709, 711-712 (9th Cir. 1995)).

One method of evaluating the primary purpose is to conduct a Rule 403 analysis, weighing the testimony's impeachment value against its tendency to prejudice the opposing party unfairly or to confuse the jury.  See id.; United States v. Ince, 21 F.3d 576, 580 (4th Cir. 1994), United States v. Buffalo, 358 F.3d 519, 523 (8th Cir. 2004).  In other words, the court in determining whether a party's witness's testimony is admissible, "or on the contrary is a mere subterfuge to get before the jury substantive evidence which is otherwise inadmissible" . . . the court should "weigh the testimony's impeachment value against its tendency to prejudice [the opposing party] unfairly or to confuse the jury." United States v. Ince, 21 F.3d 576, 580 (4th Cir. 1994) (internal quotes omitted). "The application of the 'mere subterfuge' or 'primary purpose' doctrine focuses on the content of the witness's testimony as a whole.  If the witness's testimony is useful to establish any fact of consequence significant in the context of the litigation, the witness may be impeached."  When the primary purpose is to impeach the witness, then it is not allowed by the law.  See Libby 475 F. Supp. 2d at 83, citing United States v. Johnson, 802 F.2d 1459, 1466 (C.A.D.C. 1986).

47

### G.    Character Witnesses

Pursuant to Federal Rule of Evidence 405, defendants may call witnesses to testify regarding their reputation by testimony in the form of an opinion from a witness.  See Fed. R. Evid. 405.

Under Rule 405, however, should defendants call witnesses to testify regarding their good character, the Court may allow the government to conduct "an inquiry into relevant specific instances of the person's conduct."  Id.  Accordingly, should defendants call character witnesses to testify at trial, the government intends to question defendants' witnesses concerning specific instances of defendants' conduct, including their conduct in this case.

### H.    Irrelevant Evidence

A defendant's right to present evidence in support of his defense is not without limits.  See Greene v. Lambert, 288 F.3d 1081, 1090 (9th Cir. 2002).  "[W]ell-established rules of evidence permit trial judges to exclude evidence" that is irrelevant, lacking in foundation, or when "its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury."  See Holmes v. South Carolina, 547 U.S. 319, 326 (2006).  Rule 401 defines "relevant evidence" as evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  Rule 402 provides that only relevant evidence is admissible at trial.  See Fed. R. Evid. 402.

Moreover, even evidence that is deemed relevant may not be admissible where "its probative value is substantially outweighed by the danger of unfair prejudice."  Fed. R. Evid. 403.  Prejudice does

48

not mean detriment to a party's case, but rather, undue tendency to suggest a decision on an improper basis, or to influence the outcome of the trial by improper means.  See United States v. Anderson, 741 F.3d 938, 950 (9th Cir. 2013).  In determining whether the probative value of evidence is substantially outweighed by the danger of unfair prejudice, the court must determine, even if the evidence is taken as true, whether the value of that evidence outweighs the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.  See United States v. Evans, 728 F.3d 953, 964 (9th Cir. 2013).

Where evidence has marginal probative value, even a modest risk of undue delay or confusion will justify excluding the evidence under Rule 403.  See United States v. Espinoza-Baza, 647 F.3d 1182, 1190 (9th Cir. 2011).  Evidence that does not go to the element of the offense has low probative value.  See United States v. Gonzalez-Flores, 418 F.3d 1093, 1098 (9th Cir. 2005).

### 1.   Specific Information Concerning Recording Devices

As the government argued in greater detail in its motion in limine to preclude questioning on matters subject to law enforcement sensitive qualified evidentiary privilege (CR 105), defendants should not be permitted at trial to inquire of witnesses regarding the specific details of the recording and electronic surveillance devices that were used during the investigation of this case.  While the government does not object to general questions regarding the type of recording captured (e.g., video versus audio), the Court should preclude inquiry about the devices themselves, as well as the locations where the devices were concealed.  That information is

49

irrelevant to any issues at trial and its disclosure would seriously impair the ability of law enforcement to conduct future investigations.  Indeed, there is no credible theory in which the defense could legitimately claim that information regarding the recording and electronic surveillance devices, or the locations in which they were concealed, is relevant to any issue in this case.

Moreover, several courts have extended the Supreme Court's "informer's privilege," as set forth in United States v. Roviaro, 353 U.S. 53, 59 (1957), to cover such investigative techniques as: (1) the location of a surveillance post, United States v. Harley, 682 F.2d 1018, 1020 (D.C. Cir. 1982); (2) the type and location of the microphone used to record conversations later admitted as evidence in a criminal case, United States v. Van Horn, 789 F.2d 1492, 1507-08 (11th Cir. 1986); (3) the location of microphones used to record conversations later admitted as evidence in a criminal case, United States v. Cintolo, 818 F.2d 980, 1001-03 (1st Cir. 1987); (4) information relating to a global positioning system ("GPS") device attached to a defendant's car during a criminal investigation, United States v. Rose, 2012 WL 1720307, at *1-4 (D. Mass May 16, 2012); and (5) technology used to locate an air card connected to the defendant's laptop computer that was used to locate and arrest the defendant, United States v. Rigmaiden, 844 F. Supp. 2d 982 (D. Ariz. 2012).  The mere fact that a device may be known and even available to the public does not mitigate any concern regarding disclosure of details about the device.  Id. at 995.

Thus, disclosure of information regarding law enforcement's devices and the locations of those devices raises a real possibility of revealing sensitive information that could cause harm to the

national security interests of the United States, including ongoing investigations that utilize the same recording or electronic surveillance devices.  Given that information of the devices or the locations where they were concealed has no relevance to this case, the Court should find that the law enforcement privilege and preclude the introduction of such evidence at trial.

### 2.    Unrelated Investigations

Similarly, defendants should not be permitted to attempt to introduce evidence or inquire into the substance of investigations into other unrelated subjects.

Introduction of such evidence at trial should not be permitted because a factual inquiry about unrelated cases is not relevant to this case and would not be appropriate.  Indeed, the circumstances involving those unrelated investigations have no "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable."  See Fed. R. Evid. 401.

Moreover, to the extent defendants may attempt to argue that the unrelated investigations are relevant to this case, the Court should preclude introduction of that evidence based on the law enforcement privilege.  Importantly, discussion of the unrelated cases, some of which may be ongoing, could potentially jeopardize and harm the investigations by disclosing details of law enforcement's efforts to investigate the criminal activity.

### 3.    Classified Information

Defendants additionally should not be permitted to question a witness in a manner calling for the disclosure of classified information, as defined by the Classified Information Protection Act

("CIPA"), 18 U.S.C. App. 3.  CIPA defines classified information as "any information or material" determined to be classified by the United States Government pursuant to executive order, statute, or regulation.  18 U.S.C. App. 3 at § 1; see also United States v. Abu Ali, 528 F.3d 210, 255 (4th Cir. 2008) (discussing CIPA's application to witness testimony to "ensure classified information remains classified"); United States v. North, 708 F. Supp. 399, 399–400 (D.D.C. 1988) ("[CIPA] applies to classified testimony as well as to classified documents.").  By its plain terms, CIPA "evidence[s] Congress's intent to protect classified information from unnecessary disclosure at any stage of a criminal trial." United States v. O'Hara, 301 F.3d 563, 568 (7th Cir. 2002).

A defendant who reasonably anticipates disclosing classified information at pretrial or trial proceedings must notify the government pursuant to CIPA § 5.  18 U.S.C. App. 3 at § 5; see, e.g., United States v. Sarkissian, 841 F.2d 959, 965-66 (9th Cir. 1988).  Following a defendant's § 5 notice, the government may move under § 6 for a determination as to the use, relevance, and admissibility of such classified information, and, under § 7, may consider whether to appeal any adverse § 6 determination.  If the defendant fails to provide the requisite § 5 notice, the Court may preclude disclosure of or inquiry into that area of classified information.  18 U.S.C. App. 3 at § 5(b).  While the government provided notice of its intent to utilize the CIPA on June 19, 2015 (CR 29), neither defendant has yet to file notice of his intent to disclose classified information at trial as required by CIPA § 5.

At this time, the government does not anticipate there would be any admissible line of inquiry at trial proceedings that would call

for the disclosure of classified information.  Moreover, since neither defendant has filed notice of his intent to disclose classified information at trial as required under CIPA § 5, the government believes that all or nearly all anticipated issues relating to classified information have been resolved.  Thus, the government submits that the Court should preclude any questioning by defendants that would require a discussion of classified information, including any de-classification of information and references to the particular type of court authorization for searches and seizures (e.g., references to Foreign Intelligence Surveillance Act or Foreign Intelligence Surveillance Court orders).

Should the defense, presumably inadvertently, question a witness at trial in a manner calling for the disclosure of classified information, the government intends to object and invoke CIPA § 8(c), which governs situations where a defendant, presumably unknowingly, embarks on a line of inquiry calling for the disclosure of classified information.  Upon an objection by the government, the Court must, pursuant to § 8(c), take "suitable action to determine whether the response is admissible as will safeguard against the compromise of any classified information."[8]  Id.  Such "suitable action" may include requiring or granting the government leave to proffer to the Court, ex parte, the anticipated classified testimony.  See United States v. Mohamed, 410 F. Supp. 2d 913, 914–15 (S.D. Cal. 2005) (granting the government's request to provide the court, ex parte, documentation of the classified testimony and related classified document that the defendant's proposed inquiry

---

[8] In this case, the government intends to raise objections under CIPA § 8 by stating "Objection, Section 8."

would reveal).  The Court may similarly request or afford the defendant the opportunity to submit a proffer, ex parte, explaining the relevance and materiality of the intended line of inquiry.  See United States v. Marzook, 435 F. Supp. 2d 708, 747 (N.D. Ill. 2006) (providing defense counsel the opportunity to proffer, ex parte, the "relevance and materiality of this classified information to their case").

In taking "suitable action," as called for in § 8, the Court must ultimately decide whether classified information implicated by the questioning is relevant and admissible.  The circuit courts that have considered this issue agree that the ordinary rules of evidence determine admissibility under CIPA.  See, e.g., United States v. Passaro, 577 F.3d 207, 220 (4th Cir. 2009); United States v. Anderson, 872 F.2d 1508, 1514 (11th Cir. 1989); United States v. Wilson, 750 F.2d 7, 9 (2d Cir. 1984); United States v. Wilson, 732 F.2d 404, 412 (5th Cir. 1984).  "A district court may order disclosure only when the information is at least essential to the defense, . . . necessary to his defense, and neither merely cumulative nor corroborative . . . nor speculative."  United States v. Smith, 780 F.2d 1102, 1110 (4th Cir. 1985) (citations omitted).

Lastly, if the Court determines that the defendant's proposed line of examination is relevant and that classified information is admissible, having taken "suitable action" pursuant to § 8(c), the government may invoke CIPA § 7, which permits the government to take an interlocutory expedited appeal of a district court's order authorizing the disclosure of classified information, sanctioning the government for nondisclosure, or refusing to issue a protective order sought by the government in order to prevent disclosure of

54

classified information.  18 U.S.C. App. 3 at § 7.  If the government appeals, trial shall not commence, or must be adjourned if already commenced, until the appeal is resolved.  Id.

### 4.    Punishment

It has long been the law that it is inappropriate for a jury to consider or be informed of the consequences of their verdict.  See Rogers v. United States, 422 U.S. 35, 40 (1975).  In United States v. Frank, the Ninth Circuit stated:

> To inform the jury that the court may impose minimum or maximum sentence, will or will not grant probation, when a defendant will be eligible for parole, or other matters relating to disposition of the defendant, tend to draw the attention of the jury away from their chief function as sole judges of the facts, open the door to compromise verdicts and to confuse the issue or issues to be decided.

956 F.2d 872, 879 (9th Cir. 1991) (quoting Pope v. United States, 298 F.2d  507, 508 (1962)).  The Ninth Circuit Model Jury Instructions specifically instruct juries that "the punishment provided by law for this crime is for the court to decide.  You may not consider punishment . . . ."  See Ninth Circuit Model Jury Instructions, Criminal, No. 7.4 (2010 ed.).  The possible punishments for the offenses charged in this matter are irrelevant to the jury's role as fact finder, and any reference to punishment should be precluded.  "The jury should base its verdict on the facts presented at trial, rather than on speculation about the effect of a given verdict on the defendant and on society."  Frank, 956 F.2d at 883.

### I.    Impermissible Defenses

At trial, defendants may invoke a free exercise of religion defense and a mental condition defense.  The government has thus

submitted motions in limine to preclude "right to exercise religion" defense and to preclude "mental condition" evidence. (CR 103, 106.)

As argued in detail in the corresponding motion in limine, defendants are not entitled to a defense based on the Free Exercise Clause of the First Amendment because § 2339B's prohibition on the provision of personnel to a designated foreign terrorist organization does not impermissibly burden defendants' freedom to exercise their religion, and therefore a defense of free exercise of religion is not supported by law. See United States v. Mohamud, 941 F. Supp. 2d 1303, 1321 (D. Or. 2013) (defendant was not entitled to a First Amendment defense that appealed, inter alia, to "right of exercise of religion" because "the First Amendment was not a defense to the charge brought against Mohamud — attempted use of a weapon of mass destruction — because the offense conduct contains no element of activity protected by the First Amendment"); see also Holy Land Found. for Relief & Dev. v. Ashcroft, 333 F.3d 156, 167 (D.D.C. 2003) ("There is no free exercise right to fund terrorists."). Cf. United States v. Whittemore, 776 F.3d 1074, 1078 (9th Cir. 2015) (theory of defense jury instruction not available when the theory was not supported by law).

As for any mental condition defense, to date neither defendant has provided notice of such defense as required by Rule 12.2(b) of the Federal Rules of Criminal Procedure. As submitted in a separate motion in limine, the government asks the Court to preclude both defendants from introducing at trial any argument or expert evidence relating to a mental condition. See Fed. R. Crim. P. 12.2(d)(1)(A).

//

//

56

**J.    Reciprocal Discovery**

To the extent that there exists reciprocal discovery to which the government is entitled under Fed. R. Crim. P. 12.1, 12.2, 16(b), or 26.2 that defendants have not produced, the government reserves the right to seek to have such materials excluded at trial.  See United States v. Young, 248 F.3d 260, 269-70 (4th Cir. 2001) (upholding exclusion under Rule 16 of audio recording evidence defendant did not produce in pretrial discovery where defendant sought to introduce audiotape on cross-examination of government witness not for impeachment purposes, but as substantive "evidence in chief" that someone else committed the crime).

Dated: June 2, 2016                   Respectfully submitted,

EILEEN M. DECKER
United States Attorney

PATRICIA A. DONAHUE
Assistant United States Attorney
Chief, National Security Division


_____/s/_____
JUDITH A. HEINZ
Assistant United States Attorney


_____/s/_____
DEIRDRE Z. ELIOT
Assistant United States Attorney


_____/s/_____
JULIUS J. NAM
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA